Speir, J.
[Dissenting.] —On July 9, 1870, the defendants wrote a letter to the plaintiff in Paris whereby they employed the plaintiff to sell for them in France certain arms and military goods, and agreed to pay to him as compensation for his services in selling the same, or any part thereof, the difference between certain prices therein stated and the price which should be obtained on the sale thereof. They also offered to sell to the plaintiff at the same price any of the said goods.
An important feature in the answer, directly bearing upon the main question in issue between the parties, is the allegation relied upon by the defendants, as a defense to the plaintiff’s claim, that the firm of B. *110 Remington & Sons were interested with them in certain of the arms, and that, in reliance upon an alleged agreement made by their agent Reynolds with the plaintiff, in changing prices, which it was asserted was made by the letters of September 27, 1870, they had settled with E. Remington & Sons, paying them over $20,000 more than if they had settled by the prices of July 9, 1870 ; that they would not have paid said sum to the Remingtons if they had believed that the plaintiff had any just claim against them other than as stated in the letters of September 27, 1870; and they therefore insisted upon the $20,000 by way of counter-claim. This issue in the pleadings, and the abandonment of this counter-claim, will be referred to presently.
The letter of July 9, 1870, was written in anticipation of war between France and Prussia. On July 4, 1870, the proceedings in the corps legislatif everywhere produced the belief that war was inevitable. The .French legislature declared war on the 15th, and on the following 19th of July, the French Minister left Berlin. The defendants, between July 15-and 19, began to write letters to different people in Europe on the subject of selling arms, and among others wrote the letter in question. It is appar-' ent from the whole record that the future negotiations were subsequent to the declaration of war, and there is no intimation that the business arrangement between the parties had become invalid by the fact of war. If the letter, therefore, was accepted and acted upon, the question of war has nothing to do with the validity of the contract between the parties, provided its performance was not rendered impossible by any act of law. This is not claimed.
On the said July 29, the plaintiff’s firm replied to the letter of July 9, to the effect that he could do nothing without samples, and even with samples he hardly *111 knew what could be done, as the war department had written that it was fully supplied. As the defendants had written in the proposal of July 9, “You can telegraph us if you think necessary,” the plaintiff on August 23, then next, telegraphed to the defendants inquiring ‘ ‘ How many arms they- could ship with 400 cartridges each,” and that he, the plaintiff, could probably contract all having that number.” This message refers in terms to the letter of “ July 9,” as .plaintiff’s ground of action. On the following day the defendants’ answer by telegraph, “ Can furnish about all the arms per our letter of July 9,” and it informs the plaintiff, Our Mr. Reynolds left with full set of samples by steamer Brest last Sunday-—meet him.” The plaintiff wrote on August 26 to the defendants, repeating his telegram of the 23rd, and the defendants, on the following September 7, acknowledged the receipt of plaintiff’ s letter of August 26, and in it confirms in detail the prices contained in the first letter of July 9, 1870. They write, “We still can furnish 1500 Remington rim fire carbines, cal. 52, $15.50, metallic cartridges for ditto $21.50,” etc., etc. This letter of September 7, 1870, was written only seven days before the sale was made ; and the sale was made before the letter could reach Paris.
Prom the above correspondence it is plain that the defendants’ offer in their letter of July 9 was accepted by the plaintiff, and upon the terms proposed. Up to this point the negotiation was conducted solely between the plaintiff and the defendants, and there is no conflict of evidence. The terms proposed were not only accepted by the plaintiff, but clearly ratified by the defendants’ acceding to his requests in forwarding samples, without which sales could not be made, and without change in the prices for the goods to be sold.
A contract then existed between the parties by which the defendants became bound in law to pay to *112 the plaintiff for all such goods named in their offer of July 9, 1870, as he should sell to the French government or any one else, for his services on such sale the difference between the prices in such offer stated for the goods and those which he should obtain upon their sale.
Were any material changes made in the terms of this contract by the plaintiff, either with the defendants or their agent, Reynolds %
It is claimed that when Reynolds went to Paris he had certain instructions as the defendants’ agent in the sale of the goods, and that, prior to September 15, 1870, the date of the French sale, he and the plaintiff had agreed upon an advance in the prices contained in the 'letter of July 9, correspondingly reducing the plaintiff’s compensation. On the part of the plaintiff it is claimed that the agent had no authority from his principals to change the prices, that the defendants had not given such instructions to their agent, or claimed to have made any change, until after the sale had been completed.
Mr. Reynolds left New York for Paris August 20, 1870, and the first interview with the plaintiff was had September 2 following. Reynolds took with him samples of goods from the defendants which the plaintiff had called for. These samples were marked for the plaintiff, and the bills of lading stated the goods to be for him. The defendants’ letter, introducing him to the plaintiff, August 19, 1870, makes no mention of prices. “ It trusts that the plaintiff will give him his hearty co-operation, that the plaintiff would find him well posted as to the quantity and quality of arms, and he would represent the firm in .obtaining arms and cartridges.” These arms and cartridges were to “be obtained from the defendants in New York, the quantity and quality of which was known to Reynolds.
I am unable to find from the correspondence any *113 evidence that the defendants at any time before the sale pommunicated to the plaintiff or the agent, Reynolds, that they had changed the prices of the goods. The sale was made on September 14, 1870, and communicated to the defendants by a telegraphic dispatch the same day, in cipher, devised by the plaintiff, and agreed upon between the parties beforehand; and the prices named therein are the prices of the letter of July 9, 1870. On September 7, the defendants wrote, “Before this reaches you Mr. Reynolds will inform you what we can furnish,” and in this letter the prices named for the goods are the prices contained in the letter of July 9.
As the case stands it does not rest upon the conflicting testimony of Reynolds and the plaintiff relating to the conversation between them about the change of prices. There seems to be on that point a positive contradiction as to what was said. The referee having the parties before him in the light of the correspondence in the case gave unqualified credit to the plaintiff, and I a,m of the opinion the evidence fully justifies his judgment. l'Tor can I see the significance claimed by the defendants’ counsel to the one point on which Reynolds and the plaintiff appear to have agreed. The statement by both is in substance that at the time they were to show the samples to the commission of armament Mr. Reynolds exhibited to the plaintiff a statement of prices, and the latter said, “he should not accept anything of the kind, that he worked by the prices of July 9, and Mr. Reynolds said, you will have to fight, that letter with Messrs. Schuyler, Hartley & Graham.” This is in accord with the plaintiff’s case. The point is that the defendants did not change the terms of the contract until after it was executed, when they had not the right to do so. Reynolds, as agent merely, could neither by any act of his own, or by any declaration he might make, prove either his agency of *114 the defendants or the extent of his powers. The declarations or representations of Reynolds as agent, not expressly authorized by his principals, could not •bind the plaintiff unless within the scope of his agency (N. Y. Life Ins. & Trust Co. v. Bede, 3 Seld. 364).
But this is not the whole case. The defendants have furnished affirmative testimony showing, I think, conclusively that they acted upon the terms of the July letter, and did not authorize their agent, Mr. Reynolds, to raise their prices until after the sale was effected. The record shows that the defendant Schuyler was examined before the trial upon the allegation in the answer relating to the defendants’ counter-claim of $20,000, which it alleged had been paid to the Remingtons on a settlement of their respective interests in the goods. It appears from Mr. Schuyler’s testimony that the settlement was based upon the prices of the letter of July 9, 1870, and not on the prices of the letters of September 27,1870. On the examination the books were not produced, but on the trial they were produced, and from them it appears that the plaintiff is stated to have been the purchaser of the goods, and on the bill entered in the book the letter of July 9 is referred to as containing the prices at which they were sold. This evidence is confirmed by the testimony of both the agent, Reynolds, and the defendant, Hartley. It is but fair to say that the; both claim that the settlement with the Remingtons was a forced settlement, and in some way should not be deemed as binding.
But the copy of the book produced on the examination of Mr. Schuyler before the trial, did not contain the name of “May, July 9, 1870,” over the bill as settled by the defendants with the Remingtons, which appeared on the bill produced on the trial. The defendants must be concluded by their books containing the sales made by the plaintiff, at the time and the *115 prices therein named. This counter-claim set up in the answer was abandoned on the appeal by the defendants’ counsel.
On December 12, 1870, the samples which the plaintiff had written for, reached Paris, and on the following day he, co-operating with Eeynolds, as requested by the defendants, offered the goods by' sample to the commission „of armament, and in the course of the negotiation, it was agreed that four-fifths of the price which was to be paid should be paid in New York on shipment, and one-fifth thereof should be paid in Prance, on arrival of the goods, and that the plaintiff should táke his compensation out of the payment made in Prance. If this be deemed to be a variance of the contract, the answer'is that the terms were assented to by the defendants. The plaintiff’s telegram of August 23, 1870, informed the defendants that French sales would be made in Paris, and the telegram informed the defendants when the sale was made how the payments were to be made. Plainly the defendants were called upon either to decline such a change or to say to the plaintiff that they would not accept it as performance of the contract. They did neither, but received the four-fifths of the proceeds in New York, and afterwards received one-fifth, which belonged to the "plaintiff. This was a ratification. The subsequent adoption was equivalent to a prior authority.
The plaintiff must be presumed to have been selected by the defendants as their agent for his skill, discretion, and the confidence consequently reposed in him by his principals. He had been their clerk and partner in New York, and their correspondent in Paris, where he resided. He was familiar with the French language, and had access and intercourse with prominent public and military men in France. Mr. Eeynolds was not versed in the French language, and *116 could not speak it, but was familiar with the quality and quantity of goods which the defendants had, or could procure in Hew York, for sale.
The plaintiff was not in a position to delegate his authority to Reynolds, or anybody else, without express power conferred by his principals. His relation to them involved personal trust and confidence, and largely called for discretion and judgment.
It is not claimed that the goods sold, as stated in the fourth cause of action, are mentioned in the letter of July 9, 1870. The claim is for a commission of five per cent, on the sale of the goods. The defense here is that the sale of these arms was not the result of any act of the plaintiff, but that they were sold by the defendants to the French consul in Hew York. The referee has found for the plaintiff upon the ground that he, as broker, was authorized to sell the goods to the French government; that he had made such offer and it was distinctly commxinicated to the defendants, and that they adopted the offer to sell. It is true he did not himself procure any agreement to be made. He had procured and exhibited the samples, without which the French commission of armament would not have known anything of the arms. He brought the buyer and the seller together, gave notice of the price, and put the government in the way of treating with the defendants. I think the case is brought within the rule well settled, and the finding of the learned referee should be sustained.
The second cause of action was found for the defendants. The referee was of the opinion that the defendants had authorized the plaintiff to sell only for cash in Hew York, and that the plaintiff contracted to sell these goods, the whole amount to be paid in France. He came to the conclusion that the defendants did not ratify in this case what he found to be a departure from their instructions. Besides, from an examination *117 of all the testimony, I am of the opinion that there is a conflict whether the plaintiff or the defendants themselves effected the sale, and the decision of the referee on this branch of the case should stand.
The case is unusually voluminous, and a great many exceptions were taken during the progress of the trial, to the referee’s rulings in receiving and rejecting testimony. It is not necessary to examine the evidence and exceptions in detail. Much of the evidence was irrelevant, and I haye been unable to discover any valid exception. Nearly one hundred propositions of fact, and about one quarter of the number in law, were submitted for settlement. These chiefly consisted of requests to find evidence and not facts, and the referee had mostly decided by his report, those which the party had the right to require him to pass upon. I am of the opinion that there is ample evidence in the case, independent of the objections and exceptions taken,, to support the judgment, and the findings and conclusions upon which it rests.
The judgment entered on the report of the referee must be affirmed.